OPINION
Plaintiff-appellant Burlie Quartman appeals from a summary judgment rendered against him on his malicious prosecution complaint against defendants-appellees Michael Martin, David Ferdelman and Carol Ewing. The trial court had found that there was no genuine issue of material fact, and that the defendants were entitled to judgment as a matter of law with respect to both the malicious prosecution complaint against them, and their assertion that the complaint is barred by the municipal immunity provided for in R.C. 2744.03. In arguing both assignments of error, Quartman relies upon his contention that there is a genuine issue of material fact concerning the issue of whether the defendants lacked probable cause to institute criminal charges against Quartman. Quartman contends that in making this determination, the court must consider not only the facts and circumstances known to the defendants at the time of Quartman's arrest, but also certain exculpatory evidence coming to their attention thereafter.
In assuming, without deciding, that Quartman is correct in relying upon the exculpatory evidence coming to the defendants' attention after Quartman's arrest, we nevertheless conclude that there is no genuine issue of material fact as to whether the defendants lacked probable cause to institute criminal charges against Quartman, and that, as a matter of law the defendants had probable cause. Since the lack of probable cause is an essential element of a malicious prosecution claim, summary judgment was properly rendered against Quartman on his claim, thereby rendering moot the issue of municipal immunity. Accordingly, the judgment of the trial court is Affirmed.
 I
On September 16, 1998, defendant-appellee David Ferdelman, a Dayton police officer, responded to a report by an elementary school psychologist of an alleged sexual offense. Upon arriving at the scene, Ferdelman talked to the alleged victim, S.C., who told Ferdelman that plaintiff-appellant Burlie Quartman, her stepfather, had repeatedly forced her to engage in sexual intercourse with him over the past four years, including as recently as the previous day. Ferdelman contacted his supervisor, defendant-appellee Michael Martin, a Dayton police sergeant. Martin instructed Ferdelman to transport S.C. to Children's Medical Center for a rape examination. Ferdelman also requested defendant-appellee Carol Ewing, a Dayton police detective with the Sexual Assault Squad, to go to Children's Medical Center to investigate the allegations. Martin and Ewing met Ferdelman at Children's Medical Center. Ewing interviewed S.C., and then interviewed S.C.'s mother, R.M.Q., Burlie Quartman's wife. Ewing decided that Quartman should be arrested and charged with multiple sexual offenses. Ferdelman and Martin assisted with the arrest. Following the arrest, Ewing interviewed Quartman, who maintained his innocence, and told Ewing that his stepdaughter was making up the accusations because she wanted to go live with her real father. Quartman also told Ewing that he had been at the Plasma Center on Salem Avenue on the afternoon of September 15, 1998.
The day following Quartman's arrest, Ewing talked to the manager of the Plasma Center, and determined that their information indicated that Quartman had been tested as a possible blood donor at about 3:30 p.m. on September 15th, had not been accepted as a donor, and had left before 4:30 p.m. S.C. told Ewing that she had been raped on September 15th after she got home from school. She was in the sixth grade.
On September 21st, Ewing determined that no semen had been found as a result of the rape kit. She also talked to the hospital, and found that all the tests had come back "normal." The next day, September 22, 1998, Quartman was indicted by a grand jury on two counts of Rape, thirteen counts of Rape of a Person Under the Age of Thirteen, and three counts of Gross Sexual Imposition of a Person Under the Age of Thirteen.
Ultimately, Quartman was tried by a jury on all eighteen counts. At the close of the State's case, ten of the counts were dismissed by the judge. Quartman was acquitted of the remaining eight counts in the indictment.
Quartman brought this action for malicious prosecution against the police officers who had arrested him. The defendants moved for summary judgment, contending that there was no genuine issue of material fact on the issue of the defendants' lack of probable cause for the "arrest and prosecution" of Quartman. Lack of probable cause is an essential element of a malicious prosecution cause of action. The defendants also argued that there was no genuine issue of material fact as to whether their arrest and charging of Quartman was committed with malicious purpose, in bad faith, or in a wanton or reckless manner, so that they were immune from suit by virtue of R.C. 2744.03.
The trial court, after considering the memoranda and affidavits of both parties, concluded that the defendants' motion for summary judgment was well-taken, both with respect to the malicious prosecution claim and the municipal immunity defense, and rendered summary judgment for the defendants. From the judgment rendered against him, Quartman appeals.
 II
Quartman's First Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT ON THE GROUND THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT ON THE QUESTION OF WHETHER APPELLEES HAD PROBABLE CAUSE TO PROSECUTE APPELLANT.
In their reply memorandum in support of their motion for summary judgment, the defendants argued that the existence or lack of probable cause must be determined as of the time of their arrest of Quartman, and that information subsequently coming to their attention ought not to be considered. In its decision sustaining their motion, the trial court agreed. Both the defendants and the trial court cited, in support of this proposition, McFinley v. Bethesda Oak Hosp. (1992), 79 Ohio App.3d 613, and Melanowski v. Judy (1921), 102 Ohio St. 153. We have reviewed those cases, and we note that they involved complaints by citizens, not police officers. Essentially, in each case, a citizen concluded that a criminal offense had been committed and summoned a police officer, who made an arrest. The malicious prosecution actions were brought against the citizen making the charge, not the arresting police officer. Thus, the citizen's institution of the criminal charge was completed when the arrest was made, barring the subsequent signing or filing of a criminal complaint, which is not alluded to in either of the cited cases.
In the case before us, by contrast, the malicious prosecution action has been brought against the arresting police officers. It is less clear that their role in the institution of criminal charges can be deemed to be complete before a superseding determination of probable cause has been made by a judge or grand jury. We would assume, for example, that a police officer who has effected an arrest, resulting in a suspect's incarceration in jail, would be under some duty to effect that person's release from jail if it becomes clear to the police officer, before an indictment or preliminary hearing independently establishes probable cause, that the police officer has made a mistake and got the wrong man. We can see a reasonable inference of malice arising if the police officer becomes aware that he or she has got the wrong man, but decides to permit that individual to languish in jail nevertheless, even though the only authority, at that point, for the suspect's continued incarceration is the arrest effected by the police officer.
However, we need not decide this issue in this case. Assuming, arguendo, that the exculpatory evidence subsequently coming to the attention of the police officers, to which Quartman refers, can properly be considered in determining whether there was a lack of probable cause, we conclude that there is nevertheless no genuine issue of material fact concerning that issue.
We note, preliminarily, that there is no dispute of fact concerning the information made known to the police officers before and after Quartman's arrest. The issue is whether that information amounted to probable cause — an issue of law.
For this purpose, probable cause has been defined as:
 A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.
Melanowski v. Judy, supra, at 156. See, also, Huber v. O'Neill (1981),66 Ohio St.2d 28, at 30.
When Quartman was arrested, the defendants had information that S.C., his alleged victim, had reported to an intern psychiatrist or psychologist (the affidavits and reports submitted to the trial court are inconsistent on this point) that Quartman had had sexual intercourse with her the previous day, and that this had been occurring for approximately four years. Two of the defendants, Martin and Ewing, spoke directly to S.C. Ewing conducted an interview of S.C., which is summarized by her, in her report, as follows:
 [S.C.] IS A 6TH GRADER AT KEMP SCHOOL. SHE SAID THAT QUARTMAN HAS BEEN RAPING HER SINCE ABOUT 1994. SHE SAID SHE TOLD HER STEP-MOTHER, [R.A.] SEVERAL WEEKS AGO. [R.A.] TOLD HER TO TELL HER SCHOOL COUNSELOR ABOUT IT. SHE SAID THE COUNSELORS ONLY COME IN ON WEDNESDAYS, SO SHE WAITED NTIL [sic] WEDNESDAY, 9-16-98, TO TALK TO SOMEONE. SHE SAID SHE NEVER TOLD BECAUSE SHE FEARED QUARTMAN. SHE SAID HE HAS A VIOLENT TEMPER AND BACK WHEN THE ABUSE FIRST STARTED HE SHOWED HER A SHOTGUN. THE FIRST TIME HE RAPED HER, SHE WAS 8 OR 9 YEARS OLD. SHE SAID HER MOTHER AND HE WERE RECENTLY MARRIED. THEY WERE LIVING ON RIVERVIEW. IT WAS SUMMERTIME, EITHER JUNE OR JULY. SHE WAS IN HER HOME IN THE AFTERNOON, WATCHING T.V. NO ONE ELSE WAS HOME. AT THAT TIME IT WAS JUST HERSELF, THE MOM AND BURLIE LIVING TOGETHER. HER MOTHER WAS AT A DRUG TREATMENT CLASS (EVERY TUESDAY NIGHT). QUARTMAN CAME INTO HER ROOM AND STARTED TALKING TO HER ABOUT SEX. HE ASKED HER TO HAVE SEX WITH HIM AND SHE SAID NO. HE LEFT AND RETURNED WITH A SHOTGUN. SHE SAID HE SAID NOTHING, HE JUST SAT IT THERE. HE THEN PULLED HER PANTS/PANTIES DOWN (SHE COULD NOT RECALL IF HE TOOK THEM OFF OR JUST DOWN). HE THEN PULLED HIS PANTS DOWN (AGAIN, UNKNOWN AS TO OFF OR JUST DOWN). WITH HIS HANDS, HE TURNED HER AROUND. HE TOLD HER TO GET ON HER KNEES. SHE STARTED CRYING. HE PUT SOME LOTION (BABY OIL OR LOTION — JOHNSON'S IN A PINK, WHITE AND BLUE BOTTLE) ON HIS PENIS AND THEN PUT HIS PENIS INTO HER RECTUM. SHE SAID IT HURT AND SHE TOLD HIM. HE SAID HE WAS SORRY, BUT CONTINUED. WHEN HE FINALLY PULLED HIS PENIS OUT, SHE SAID SHE FELT WET. HE THEN WIPED HER OFF WITH A WASHCLOTH THAT HE HAD BROUGHT INTO THE ROOM WITH HIM. SHE SAID SHE SAID [sic] HE SAID NOTHING TO HER. A COUPLE OF DAYS LATER HE CAME INTO HER ROOM WHILE SHE WAS SLEEPING. SHE WOKE UP TO HIM RUBBING HER BOTTOM WITH IS [sic] HAND ON TOP OF HER CLOTHES. HE TOLD HER TO PULL HER PANTS DOWN. SHE DID AS HE TOLD HER. HE PULLED HIS PANTS DOWN. HE TOLD HER TO GET ON HER KNEES. SHE DID SO. HE INSERTED HIS PENIS INTO HER RECTUM. AGAIN HE HAD PLACED LOTION ON HIS PENIS. SHE SAID THE SAME THING WOULD OCCUR ABOUT 20 TIMES A MONTH. SHE SAID SHE WAS AGE 10 WHEN HE STARTED TO PUT HIS PENIS INTO HER VAGINA. SHE SAID IT WAS WARM OUTSIDE (SUMMERTIME). HE TOLD HER TO LAY ON HER BACK THIS TIME AND HE VAGINALLY RAPED HER. AGAIN SHE SAID THIS WOULD OCCUR ABOUT 20 TIMES A MONTH. SHE SAID NOTHING HAPPENED LAST MONTH (AUGUST) BECAUSE SHE WAS WITH HER SISTER. THE LAST TIME HE RAPED HER WAS 9-15-98. SHE SAID SHE HAD JUST GOTTEN HOME FROM SCHOOL. HER MOM WAS NOT HOME. HER STEP-BROTHER, [B.], WAS HOME. [B.] STAYED IN HIS ROOM. QUARTMAN TOLD HER TO COME INTO HIS ROOM. SHE TRIED TO STALL HIM BY SAYING THAT SHE HAD HOMEWORK. SHE EVENTUALLY WENT INTO HIS ROOM. HE UNBUTTONED HER SHORTS AND PULLED DOWN HER PANTIES AND PANTS OFF ONE LEG. HE PULLED HIS PANTS DOWN. HE TOLD HER TO LAY ON HER BACK. HE GOT ON TOP OF HER AND PUT HIS PENIS INTO HER VAGINA. SHE SAID HE EJACULATED ON HER PUBIC HAIR. HE GOT THE WASH CLOTH AND WIPED HER OFF. SHE SAID SHE FINALLY TOLD BECAUSE SHE OF [sic] TIRED OF THIS HAPPENING. SHE SAID HER SISTER, [S.R.], AGE 18 LIVES IN LIMA, OHIO WITH HER FATHER. SHE MOVED OUT YEARS AGO.
(Capitalization in original.)
Ewing also talked to Quartman and his wife, the alleged victim's mother, separately. During her conversation with S.C.'s mother, Ewing "asked if Quartman had ever requested anal intercourse and she said he did in 1993 and she refused. She said he had asked her about 2 months ago again for anal intercourse and again she said no. She said that he said he can get sex any time and he does not have to go far to get it."
Ewing also talked to Quartman. He denied the allegations, contending that he had never touched S.C. He said that S.C. was making the allegations up because her sister wanted to break up his marriage with their mother, and have their mother remarry their father. With respect to the preceding day, when the last rape allegedly occurred, he said that he had picked his son up at 2:20 p.m., and dropped him off at home. He said that he had then left the house and went to the Plasma Center on Salem Avenue, getting home around 5:30 p.m., and staying home the rest of the evening. He said that S.C. gets home around 3:00 p.m.
Ewing was not able to get in touch with R.A. on the day of the arrest, but did talk with her the next day. She confirmed that S.C. had reported to her the sexual conduct with Quartman, indicating that S.C. was scared that if she told her mom, her mom would kill Quartman, and go to jail. R.A. confirmed that she told S.C. that she needed to tell a counselor at school about the sexual conduct.
Quartman had told Ewing that his father, J.Q., was at the home on the afternoon of September 15th, when the last rape allegedly occurred. Ewing talked to J.Q. the day after the arrest, but noted that he was difficult to talk to because he seemed confused with the questions asked. Ewing's notes reflect that J.Q. told her that he was at home some of the time that day, but did not recall what time his son had left or come home. Also that day, September 17, 1998 Ewing talked to R.M.Q., Quartman's wife and the victim's mother. R.M.Q. told Ewing that on Tuesday she had met Quartman at the BP Gas station on Salem Avenue near Gettysburg around 5:30, and that they then went home, getting home around 6:00 p.m. She said that Quartman had mentioned to her that he had gone to the Plasma Center.
In his reply to the defendants' motion for summary judgment, Quartman offered a transcript of testimony of Dana Drazner, a pediatric emergency medicine physician called by the State to testify at Quartman's criminal trial. Drazner had examined the victim, S.C., at the emergency room. Drazner testified that the victim's genital development was rated five on the Tanner scale, which runs from one to five. Drazner testified that this meant that the victim's genital organ was physically mature to the point that it was indistinguishable from that of an adult woman. She testified that the significance of this was that vaginal intercourse the preceding day would not likely have left any abrasions or other observable signs at the time of the examination. Furthermore, she testified that the thinning of the hymen associated with the victim's sexual development was to the point that it was unlikely that any observable scars or other physical indicia from acts of vaginal intercourse earlier in her sexual development would have survived to the date of the examination. Drazner also testified that anal intercourse, even of a child as young as the victim was when the rapes allegedly began, would not normally leave any observable signs, because the anal sphincter is designed to accommodate excretions as large or larger than an adult penis.
Quartman contends that when the exculpatory evidence that came to Ewing's attention within a day or two after the arrest is considered, there is at least a triable issue of fact whether there was probable cause for the criminal charges against him. He identifies this exculpatory evidence as the victim's motive to lie, the absence of any physical evidence of sexual intercourse on September 15, 1998, the date of the last alleged rape, and his alibi for that day.
The first piece of exculpatory evidence to which Quartman refers — the victim's motive to lie — appears to be based exclusively upon Quartman's own statement to Ewing. Obviously, that statement is self-serving. The identification of a possible motive for the alleged victim to make a false accusation is but one factor that Ewing could appropriately consider in evaluating the alleged victim's credibility.
The alibi evidence consists in part of a statement by the manager of the Plasma Center that Quartman was there from about 3:30 in the afternoon, until 4:30, at the latest. This information came from a disinterested source, and was based, in part, upon the records of the Center. In other words, this was evidence with which Ewing ought to have been impressed. However, it was not, by itself, inconsistent with S.C.'s claim that Quartman summoned her to his room, and forced her to have sexual intercourse, some time after she came home from school. The only source of information as to when S.C. came home from school is Quartman's statement that S.C. "gets home around 3:00 p.m." Besides being a self-serving statement, this appears to be a statement about S.C.'s normal time for getting home from school, rather than a specific representation of when she got home from school on September 15, 1998, the day in question.
The additional source for Quartman's alibi is his wife, the victim's mother, who told Ewing that she met Quartman at a gas station on Salem Avenue, near Gettysburg, at "around 5:30" on September 15th, and they then went home. This was not a statement given to Ewing at the time of the arrest, when Quartman and his wife were talked to separately. This was a conversation the day after the arrest, by which time Quartman and his wife would presumably have had an opportunity to consult. Admittedly, Quartman's wife is also the victim's mother, and presumably had conflicting emotions with respect to the accusations. In any event, she was hardly a disinterested witness. Finally, even if Ewing had credited her statement in full, that would only have provided Quartman with an alibi from "around 5:30" in the afternoon. There is an obvious gap between that alibi, and the one provided by the manager of the Plasma Center from 3:30 that afternoon until some time "before 4:30." Furthermore, this court has consulted a street map, and notices that Malvern Avenue, the street of the residence where the rape allegedly occurred, and the intersection of Salem Avenue and Gettysburg, near where Quartman allegedly met his wife at "around 5:30," are not far apart.
Finally, the lack of physical evidence of rape was not particularly exculpatory in view of the victim's physical maturity and the testimony of the examining physician. The fact that no semen was found is consistent with the victim's allegation that Quartman withdrew before ejaculation, ejaculating on her pubic hair, and then wiped her off with a washcloth. We note that Ewing was also made aware, after the arrest, of corroboration, by R.A., of the victim's statement that she had previously disclosed the ongoing sexual activity to R.A.
The issue is whether the facts and circumstances known to the defendants, the existence of which is not disputed, gives rise to probable cause, which, for this purpose, is defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged. In our view, even a cautious man would be warranted in the belief that Quartman was guilty of the offenses with which he was charged, based upon S.C.'s allegations, and the exculpatory evidence to which Quartman refers did not sufficiently weaken the force of S.C.'s allegations to the extent that a cautious man would not be warranted in the belief that Quartman was guilty of those offenses.
The definition of probable cause cited above is a curious mixture of subjective and objective components. "Suspicion" is inherently subjective, but the requirement that there be "a reasonable ground" of suspicion suggests that the suspicion must be objectively reasonable. The requirement that the circumstances be "sufficiently strong in themselves to warrant a cautious man . . ." suggests objectivity. The continuation of that phrase, ". . . in the belief that the person accused is guilty of the offense with which he is charged," suggests a subjective component. The blending of these objective and subjective components suggests to us that when a police officer is performing the officer's duty of apprehending and arresting persons who are suspected of having committed serious criminal offenses, some deference must be given to the police officer's evaluation of the facts and circumstances upon which that suspicion is based, especially where the police officer must evaluate the credibility of persons offering conflicting stories, as here.[1] As long as these police officers reasonably concluded, after interviewing S.C., and after having also considered conflicting information, that her allegations were sufficiently credible to warrant their belief, in the cautious exercise of their duties, that Quartman had committed the alleged acts, they cannot be said to have maliciously prosecuted him.
Quartman's First Assignment of Error is overruled.
 III
Quartman's Second Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN FINDING THAT APPELLEES WERE ENTITLED TO STATUTORY IMMUNITY IN ACCORDANCE WITH R.C. 2744.03.
This assignment of error concerns the trial court's separate determination that the defendants were entitled to judgment, as a matter of law, that they are immuned from liability by virtue of R.C. 2744.03. Because we find that the trial court correctly determined, as a matter of law, that the defendants were not liable on Quartman's claim of malicious prosecution, we find it unnecessary to determine whether the trial court correctly determined that the defendants were also entitled to judgment, as a matter of law, on their defense of municipal immunity. Accordingly, this assignment of error is overruled, as moot.
 IV
Both of Quartman's assignments of error having been overruled, the judgment of the trial court is Affirmed.
[1] In anticipation of the argument that it should be for a jury to evaluate S.C.'s credibility, based upon her demeanor and testimony at trial, it should be pointed out that the issue in the malicious prosecution action is not whether Quartman in fact did what S.C. alleged he did, but whether the defendant police officers had probable cause to believe S.C.'s accusations. Whether the police officers should have found S.C. to have been credible at the time they arrested Quartman should be determined based upon her demeanor and statements to them at that time, not her demeanor and testimony at a subsequent trial. For example, S.C. might even admit, at the trial of Quartman's malicious prosecution cause of action, that her accusations against him were wholly false, but that would not mean that the officers lacked probable cause to believe her when they arrested Quartman, based upon her demeanor at that time and the inherent plausibility of her accusations, which cannot be reliably re-created for a jury.